**In re Anonymous No. 34 D.B. 86 and 19 D.B. 87**

Disciplinary Board Docket No. 34 D.B. 86 and 19 D.B. 87.

SCHILLER, *Member,* August 9, 1990—

## I. INTRODUCTION

The Office of Disciplinary Counsel filed two separate petitions for discipline consisting of eight separate charges and 70 alleged Disciplinary Rule violations. Due to the sheer volume of this matter the board found it necessary to structure its report in the following manner:

I. Introduction

II. History of Proceeding

III. Findings of Fact and Discussion of Individual Charges: Each of the eight charges will be analyzed individually with a separate findings of fact and discussion section for each charge.

IV. General Discussion

V. Conclusions of Law

VI. Determination

## II. HISTORY OF PROCEEDINGS

Respondent, born in 1941, was admitted to the practice of law in the Commonwealth of Pennsylvania in 1966. Respondent maintains his principal office at [ ].

Office of Disciplinary Counsel filed two separate petitions for discipline against respondent as follows: No. 34 D.B. 86 consisting of five charges, filed June 18, 1986, and 19 D.B. 87 involving three charges, filed on March 25, 1987. In the two petitions for discipline, respondent was charged with the following misconduct: deliberately interfering with and refusing to permit the settlement of his clients' case; routinely using rude and offensive language; behaving aggressively towards his clients and opposing counsel; willfully disobeying court orders; appealing cases without client consent; representing multiple parties without advising his clients of the conflict of interest; failing to promptly pay or deliver to his clients funds or other property as requested; and failing to withdraw from employment when discharged by his client.

The matters were referred to Hearing Committee [ ] comprised of [ ].

By order of the Disciplinary Board dated April 21, 1987, the two petitions were consolidated for hearing. Respondent objected to the joinder of the two petitions and on June 15, 1987, filed an application

for relief with the Pennsylvania Supreme Court. On June 18, 1987, petitioner filed a motion to quash respondent's application. By order dated September 3, 1987, the Supreme Court of Pennsylvania denied respondent's application for relief.

The hearing in this matter was exhaustive and lengthy. Hearings were held on January 13, 14, 15, 1987; April 29, 1987; May 3, 4, 10, 23, 1987; January 13, 14, 1988; March 17, 18, 1988; July 21, 1988; and May 23, 1989. The Hearing Committee filed its report on March 15, 1990, in which the committee determined that most of the charges were not supported by clear and convincing evidence. The committee dismissed the unsupported charges and recommended respondent receive a private reprimand with conditions.

On April 10, 1990, Office of Disciplinary Counsel filed a brief on exceptions to the report of the Hearing Committee. Petitioner took exception to the findings of fact, conclusions of law and the recommended discipline. Petitioner argued that "many relevant and clearly established facts were omitted from the committee's report" and "more charges were supported by clear and convincing evidence than found by the committee." Petitioner also argued that "the committee's recommended sanction was inappropriate" and urged a "substantial suspension if not disbarment." (Petitioner's brief on exceptions pp. 8, 12). Respondent did not file a brief on exceptions.

On April 10, 1990, the same day petitioner filed its brief, petitioner also requested a waiver of the page limit on the brief on exceptions imposed by Disciplinary Board Rule 89.202(3)(c). (Petitioner's brief consisted of 134 pages). By order dated April 19, 1990, the Disciplinary Board granted petitioner's

request. Thereafter, respondent filed an application for reconsideration of the board's order with the Supreme Court of Pennsylvania which was denied by order dated May 21, 1990.

The matter was adjudicated by the full board at its regularly scheduled meeting held on May 24, 1990.

## III. FINDINGS OF FACT AND DISCUSSION OF INDIVIDUAL CHARGES

### A. Charge I (34 D.B. 86)—The [A] Case

(1) Findings of Fact

On March 4, 1977, [A] retained respondent to represent her in a personal injury claim against the [B] for damages arising from a motor vehicle accident which occurred on February 17, 1977. On April 11, 1978, respondent filed suit on behalf of his client in the Court of Common Pleas, [ ] County. However, respondent never filed an uninsured motorist claim on behalf of [A]. On April 29, 1978, an arbitration award was entered in favor of [A] in the amount of $6,500. With [A's] permission, respondent appealed the award. Before the case went to trial, respondent reached a settlement with defendant's counsel, [C], Esquire. The amount of $7,750 was to be paid to [A] by the [B's] insurance carrier, [D] Insurance Company. On June 7, 1983, the settlement agreement was entered on the record before the Honorable [E]. The defendant's counsel, [C], stated on the record that the case had been settled, the total payment of $7,750 would be sent to respondent accompanied by a request for a general release and an order to mark the matter settled. Respondent agreed to this proposed method of settlement.

By letter dated June 14, 1983, [C] informed respondent that he would forward the settlement draft to respondent upon receipt of an executed general release and an order to settle. By letters dated June 17, and 24, 1983, to attorney [C], respondent demanded the settlement check and refused to forward a release stating that the release was not necessary since plaintiff accepted the settlement in open court, on the record. By letter dated June 29, 1983, to Judge [E], attorney [C] requested the court's assistance in resolving the issue of respondent's objection to executing a release. By letter dated July 1, 1983, Judge [E] advised respondent to execute the release or contact his secretary to schedule a conference to settle the matter. Respondent failed to reply. By letter dated July 22, 1983, attorney [C] advised Judge [E] that respondent failed to contact him since the court's letter of July 1, 1983, and requested a conference. By letter dated July 28, 1983, Judge [E] again suggested that respondent comply with the request for an executed release. Thereafter, as requested by attorney [C], Judge [E] scheduled a conference for August 9, 1983, at 9:15 a.m.

By letter dated August 3, 1983, to Judge [E], respondent acknowledged his receipt of notice of the August 9, 1983, conference and stated he would not attend due to a conflict in schedule. Respondent also advised the court that he refused to provide the release because respondent felt that the [ ] County Court system showed favoritism to [ ] County attorneys and because the question of the release had not been raised at the time of the settlement on the record. By letter dated August 5, 1983, Judge [E] informed respondent that the conference would proceed despite respondent's absence and that his

Honor would make an appropriate determination at that time. By letter dated August 15, 1983, Judge [E] informed respondent of what occurred at the conference and requested respondent to provide him with some valid reason for not wanting to return a signed release. Respondent failed to reply.

[A] contacted [D] Insurance Company in December of 1983, and was allegedly told that her check was sent to respondent on June 14, 1983. However, respondent did not have the check. Respondent received [A's] letter dated February 6, 1984, in which [A] requested respondent to either sign the required papers or inform [D] Insurance Company that respondent no longer represented her. Despite [A's] request that respondent reply before February 11, 1984, respondent failed to reply. By letter dated March 21, 1984, [A] wrote to Judge [E], copied to respondent and attorney [C], requesting a conference concerning her case and stating that she was happy with the settlement and would like to sign a release as soon as possible. A conference was held on April 13, 1984, before Judge [E] at which respondent, attorney [C], and [A] were present. At the conference [A] signed the general release. On April 17, 1984, [D] Insurance Company reissued a check in the amount of $7,750 in settlement of [A] v. [B] and sent it to [C]. As agreed upon at the conference, attorney [C] delivered the settlement draft to the court which forwarded it to respondent who made distribution to [A]. [D] Insurance Company received the release executed by [A] after April 18, 1984. On other occasions, [D] Insurance Company had accommodated a settling party with regard to the language of the release.

(2) Discussion

In the [A] matter the parties entered into a settlement in open court on the record. The agreement established that defense counsel for [D] Insurance Company would forward a check to respondent along with a release which would be returned to defense counsel. Thereafter, respondent and counsel for the defense became embroiled in a dispute as to whether the settlement check was to be sent to respondent before or after respondent provided a general release and returned an order to mark the matter settled. The result was a clash between two strong-willed attorneys neither of whom would yield his position. Respondent took the position that since the statute of limitation had run and the settlement agreement was on record in open court, the release was unnecessary and irrelevant.

Meanwhile, [A] contacted [D] Insurance Company which allegedly informed [A] that her check was sent to respondent five months prior. However, respondent did not have the check. Under the false impression that respondent had converted her funds, [A] reported respondent to the Disciplinary Board. After consultation with Disciplinary Counsel, [A] contacted Judge [E] who scheduled a conference in order to settle the matter. After the conference, a release and order to mark the matter settled was given in exchange for the distribution of funds to [A].

Although respondent's actions were aggravating, to say the least, by strictly construing the settlement agreement that was placed on the record, such behavior does not constitute a violation of the Disciplinary Rules. The board concurs in the Hearing Committee's determination to dismiss the charges against respondent in the [A] matter.

B. *Charge II (34 D.B. 86)—The [F] Case*

(1) Findings of Fact

[F] was employed as a paralegal by respondent's firm from approximately September 22, 1982, through April 15, 1983. On January 5, 1983, [F] was involved in a motor vehicle accident and sustained minor personal injuries. Shortly afterwards, [F] signed an agreement retaining respondent to represent her in a personal injury claim and a claim for personal injury protection ("PIP") benefits arising from the automobile accident.

At the time of the accident, [F] lived with her parents and was insured under her parents' insurance policy with [D] Insurance Company. Under the [D] policy, [F's] parents elected to have their health care carrier, Blue Cross/Blue Shield provide primary insurance coverage for medical bills and expenses. Respondent filed a claim with [D] for no-fault benefits and PIP benefits on behalf of [F] on March 18, 1983, and April 1, 1983, respectively. [D] made direct payments on behalf of [F] to health care providers [G] Medical Equipment and [H] Diagnostic Services. With the exception of completing an in-office questionnaire form, [F] did not perform any work on her own file. Specifically, [F] did not personally complete nor forward any documents to [D] concerning her own claim.

On April 15, 1983, [F's] employment with respondent's law firm terminated. Thereafter, on August 13, 1983, [F] was involved in a second, more severe automobile accident. In early 1985, [F] retained [I], Esquire to represent her interests in both the August 1983 accident and the January 1983 accident. By letters dated March 1, 1984, and March 9, 1984, attorney [I] advised respondent of [F's] retention of attorney [I] and requested [F's] salary information

in regard to her August 11, 1983, claim. On April 5, 1984, respondent met with attorney [I] and provided attorney [I] a copy of [F's] 1983, W-2 form and agreed to provide [F's] file from her January 1983 accident. Thereafter, attorney [I] telephoned respondent on several occasions in regard to the [F] file. On each occasion, attorney [I] was advised that respondent was not in the office. In June 1984, [F] telephoned respondent's office requesting her file. Respondent did not provide the file to [F] nor attorney [I]. Pursuant to the Pennsylvania No-Fault Insurance Act, the statute of limitations has expired on [F's] wage loss claim.

(2) Discussion

In the [F] matter, respondent represented his employee, [F], in regard to her personal injury claim arising from a minor automobile accident. As a result of this accident, [F] lost two days of work, but respondent paid her for those days. Thus, respondent filed only a claim for medical expenses and not lost wages.

After [F's] employment with respondent terminated, she was involved in a second, more severe automobile accident. [F] retained new counsel, attorney [I], to represent her interests in both accidents. Attorney [I] requested respondent to provide [F's] employment and salary information along with her file. Respondent provided [F's] W-2 form, but did not provide the [F] file. Respondent's position is that [F] did not lose any time from work and thus a loss wage claim in regard to the first accident would be fraudulent. Furthermore, [F's] medical information could have been easily obtained from [F's] no-fault insurance carrier or medical provider. However, attorney [I] failed to proceed with [F's] legit-

imate claim for medical expenses. Attorney [I's] failure to proceed can not be attributed to respondent.

Finding no violations of the Disciplinary Rules, the board concurs in the Hearing Committee's determination to dismiss the charges against respondent in the [F] matter.

## C. *Charge III (34 D.B. 86)—The [J] Matter*

(1) Findings of Fact

While crossing a street on January 30, 1981, [J] was struck by an automobile that left the scene of the accident. Neither the owner nor the operator of the vehicle were identified. As a result of the accident, [J] is now a quadriplegic and is confined to a nursing home. On August 27, 1981, [J] gave power of attorney to his sister, [K], so that she may manage [J's] business affairs. After the accident, [K] requested respondent to see her brother, [J] in the hospital. [K] was familiar with respondent due to his representation of [J] in regard to a prior accident. Respondent went to see [J] in the hospital at which time [J] retained respondent to represent him in all claims arising from the hit and run accident. Respondent was aware of [K's] power of attorney, but only represented [J]. It is alleged [J] lived in the [K] household and therefore, was covered by Mr. [K's] insurance policy with [L] Insurance Company. Despite the fact the Pennsylvania No-Fault Motor Vehicle Insurance Act was applicable at the time of [J's] accident and provided for payment of all medical expenses, respondent did not file a claim for personal injury protection benefits on behalf of [J]. Respondent explained his reasons for not doing so as follows: [J] was content with the treatment he

was receiving and the medical bills for [J's] treatment were being paid for by the Department of Public Welfare through Public Assistance or Medical Assistance. If an application was made for PIP benefits, the Department of Public Welfare would become aware of the uninsured motorist claim and the department could assert a lien against the benefits, leaving [J] with no cash. The statute of limitation has expired with respect to [J's] claim for PIP benefits.

On March 23, 1982, respondent filed a claim with [L] for uninsured motorist benefits on behalf of his client, [J]. In August of 1982, respondent obtained the appointment of arbitrators for the uninsured motorist claim against [L]. The arbitrators selected to hear this matter were [M], Esquire, [N], Esquire, and [O] Esquire, chosen as the neutral arbitrator and chairman of the panel.

From August 13, 1982, through June 8, 1984, defendant's counsel, [P], respondent and members of the arbitrator panel engaged in a series of correspondence. [P] requested respondent to provide medical bills and a statement from [J]. Respondent refused to comply with the request and used derogatory language when referring to [P]. [P] requested a continuance of the hearing. Respondent opposed the continuance and argued for an immediate hearing, characterizing his client [J] as a "deathly ill quadriplegic." Thereafter, on April 22, 1983, [J's] statement was taken and in January of 1984, respondent provided [P] some of [J's] medical records.

On July 13, 1984, [P] filed a petition in the Court of Common Pleas of [ ] seeking to disqualify the arbitration panel. [P] argued that respondent's characterization of [J], his use of insulting language, and failure to timely produce the requested documents

was improper and prejudicial. The Court of Common Pleas denied [P's] petition.

By letter dated July 17, 1984, [P] made an offer of settlement, on behalf of [L], in the amount of the policy limits of $30,000, in return for an endorsed general release. By letter dated July 20, 1984, [P] forwarded to respondent a release and requested respondent to return it with a letter assuring [P] that [J] was aware of the release and that he had not been declared incompetent. [P] advised that upon receipt of these documents, he would immediately forward the two settlement drafts in the total amount of $30,000.. Respondent declined to accept the offer and insisted on the completion of the arbitration hearing in *[J] v. [L]*. A hearing was held and on August 9, 1984, the arbitrators made a finding in favor of respondent's client, [J], in the amount of $30,000. On October 9, 1984, Judge [Q] entered an order confirming the arbitrator's award and ordering respondent to forward to [P] an order to satisfy judgment upon receipt of the funds. By letter dated October 12, 1984, [P] advised respondent that upon receipt of respondent's written assurance that he would not appeal Judge [Q's] order [P] would forward two settlement drafts, in the amount of $15,000 each, in return for an order to satisfy judgment. [P] wrote that in the absence of such written assurance he would forward the drafts after expiration of the 30-day appeal period. Judge [Q] entered an order dated October 18, 1984, compelling [L] to pay interest on the $30,000 from the date of the award and denying respondent's motion filed in August 1984 for counsel fees in connection with the Common Pleas Court proceedings. By letter dated October 25, 1984, [P] forwarded to respondent two drafts totaling $30,000 and check in the amount of $45.50 representing costs. He advised respondent that he

calculated interest at $180, requesting that respondent advise whether that amount was acceptable, and stated that he would send the $180 providing that respondent forwarded to him an order to satisfy judgment. Respondent did not provide the order to satisfy judgment nor did he advise [P] what amount of interest he believed to be appropriate.

Under cover of letter dated October 30, 1984, respondent forwarded to [K] the two $15,000 checks with instructions regarding the method of obtaining [J's] endorsement. Thereafter, respondent met with [K] and once again instructed her how he wanted the settlement checks endorsed. On November 8, 1984, [K] obtained the "x" mark of [J] on the two drafts, signed her name, and had the endorsement witnessed. The next day, [K] went to respondent's office to return the endorsed drafts. After reviewing the settlement checks, respondent began yelling at [K]. He then tore the settlement checks rendering them unnegotiable, and threw them in the trash. According to respondent, he was angry for the following two reasons: [K] did not obtain the proper endorsement on the checks as instructed; she signed her name above [J's] "x" mark and one of the checks was improperly dated for 1985 instead of the correct year of 1984. Respondent retrieved the two damaged checks from the trash, repaired them with tape, and attempted to negotiate the checks at his bank. After the bank refused to accept the checks, respondent voided each check.

By letter dated November 13, 1984, to [P], respondent returned the damaged drafts and requested that new drafts be issued, explaining that the drafts were "damaged" upon their return from respondent's client. By order dated January 25, 1985, Judge [Q] ordered [P] to pay into the court the two drafts totaling $30,000 within five days of the order

and ordered respondent to file an order to satisfy within 15 days of the order, at which time the drafts were to be released. [P] forwarded to Judge [Q] two new drafts each in the amount of $15,000, but respondent failed to file the order to satisfy.

Meanwhile, on January 16, 1985, [J] placed a telephone call to respondent with the assistance of his sister, [K]. Due to the fact respondent was unavailable, [J] left a message requesting that respondent call him back. A few weeks later, [K] also left a message requesting respondent to return her call. Respondent failed to communicate with either [J] or [K]. In a letter of inquiry dated May 31, 1985, respondent was notified that [J] filed a complaint with the Office of Disciplinary Counsel. On July 2, 1985, [K] wrote on behalf of her brother, [J], requesting the settlement checks and information regarding the settlement. By letter dated July 8, 1985, respondent advised [K] that because the complaint had been filed against him with the Disciplinary Board, respondent "will have nothing further to do with her."

By letter dated August 9, 1985, [R], on behalf of [L], requested Judge [Q] to enter an order marking the judgment satisfied in the matter of *[J] v. [L]*. On August 14, 1985, Judge [Q] issued a rule to show cause why the matter should not be marked settled and the judgment marked satisfied. Argument was held before Judge [Q] on October 1, 1985, and by order dated October 4, 1985, Judge [Q] directed the prothonotary to mark the judgment against [L] satisfied. On November 21, 1985, Judge [Q] issued an opinion in support of his order stating the following:

"We have had many similar matters in which plaintiff's counsel has frustrated our attempts to resolve matters before us and in effect interfered

with the orderly judicial process. We cannot and will not allow this to continue.

"Plaintiff's counsel argued that he had not received the original check representing the award as his client had torn it up. Since this is about the sixth time this attorney has alleged that different clients have torn up checks, this court no longer believes this attorney when he makes that argument."

Respondent filed an appeal of Judge [Q's] order dated October 4, 1985. On May 28, 1986, the Superior Court denied respondent's appeal, per curiam, and affirmed Judge [Q's] order marking the case [J] v. [L] satisfied. Respondent subsequently petitioned the Superior Court for reargument of the appeal. The court denied, per curiam, the application for reargument on June 30, 1986.

Respondent never made any inquiry as to whether [L] had deposited with the court the $30,000 in checks or the interest. Respondent never advised [R] or [P], on behalf of [L], or the court as to the amount of interest he believed due upon the judgment. By letter dated August 12, 1986, four years after respondent filed the claim with [L] for uninsured motorist benefits, [J] discharged respondent as his attorney.

(2) Discussion

In the [J] matter, an arbitration panel awarded [J] $30,000 which represented the full amount of the insurance coverage. Defendant [L] forwarded to respondent two drafts totaling $30,000. Respondent tore the checks claiming that one check was erroneously dated and [K] failed to have the checks properly endorsed as instructed. Further litigation followed in the Court of Common Pleas which resulted in an order entered by Judge [Q] compelling [L] to pay the settlement funds into the court. [L] complied with the order and promptly deposited two

checks totaling $30,000 with the court. However, respondent failed to file the order to mark the judgment against [L] satisfied. Respondent took issue with the amount of interest owed on the delayed payment and the amount of costs due. Thereafter, Judge [Q] directed the prothonotary to mark the judgment against [L] satisfied and respondent appealed this order. The Superior Court affirmed Judge [Q's] order and denied respondent's petition for reargument.

Respondent worked diligently to strictly enforce the arbitration award and obtain the interest and costs due which respondent believes [J] was entitled. It can be reasonably implied that [J] would have wanted respondent to vigorously litigate this matter on [J's] behalf. But at the same time, it is clear that [J] also would have wanted the $30,000 at the time it became available. Despite the fact [L] deposited the checks with the prothonotary, pursuant to court order, respondent failed to obtain the funds on behalf of his client. In addition, respondent never advised [L] or the court as to the amount of interest he believed was due upon the judgment. Thus, the board concurs in the Hearing Committee's determination that respondent's conduct constituted a violation of D.R. 9-102(B)(4) which requires an attorney to promptly pay or deliver to a client, as requested funds, securities, or other properties in the lawyer's possession which the client is entitled to receive.

The board also concurs in the Hearing Committee's determination to dismiss all other alleged violations of the Disciplinary Rules in this matter. There is an aura of confusion surrounding the filing of this complaint against respondent. Respondent represented [J] in a prior case in which [J] was involved in an accident. In regard to this first case,

respondent obtained a fair settlement on behalf of [J] and gave the funds to [K] who was acting on behalf of her brother, [J]. [K] claimed she put the funds in a certificate of deposit at [S] Savings and Loan and informed [J] of her actions. However, [J] testified that he "never got a dime from [respondent]." Respondent's position is that [K] failed to advise [J] of the fact respondent had obtained a fair settlement in the first case and the funds were available to him. Thus, [J] believed respondent "stole his money." Misguided, [J] became angry, discharged respondent, and eventually filed a complaint with the Disciplinary Board.

## D. Charge IV (34 D.B. 86)—The [T]/[U] Case

### (1) Findings of Fact

On June 27, 1978, [T] owner and operator of the vehicle and [U], passenger in the vehicle were involved in an automobile accident when their vehicle was struck by an automobile driven by [V]. Both [T] and [U] sustained personal injuries and [T's] vehicle was substantially damaged. Shortly after the accident, [T] and [U] retained respondent to represent them in their claims for personal injuries and property damage arising from the accident. Respondent failed to advise [T] and [U] of the potential conflict of interest that may arise during the course of his representation of both parties. Respondent filed suit on behalf of both [T] and [U] against [V] in the Court of Common Pleas of [ ] County. In representing [U], respondent did not make a direct claim on behalf of [U] against [T]. However, defendant, [V], through counsel joined [T] as an additional defendant. in regard to the claim of [U]. Respondent did not withdraw as counsel for either

party after the joinder of [T] as an additional defendant in regard to the [U] matter.

Both defendants, [V] and [T] were insured by [L] Insurance Company. [L] retained [W], Esquire to represent [V] and retained [X], Esquire to represent [T]. In April of 1981, [X] made telephone calls and wrote letters requesting [T] to contact him in regard to the lawsuit. [T] informed respondent of [X's] attempts of communication. Respondent advised [T] to refer all communication from [X] to respondent, but failed to advise [T] that [X] was the attorney designated by [L] to represent him as an additional defendant. Respondent also failed to advise [T] of his rights and obligations pursuant to the terms of his [L] policy such as the requirement that [T] cooperate with legal counsel chosen to represent him or the company could decline coverage.

By letter dated April 1, 1981, respondent informed [X] that respondent didn't like him, didn't want anything to do with him and objected to [X's] representation of [T]. Respondent and [X] had known each other through their legal practices for years prior to the [T] case, and their relationship was poor.

On April 2, 1981, [X] filed a reply to new matter on behalf of [T]. [X] raised the statute of limitations as an affirmative defense, raised a defense pursuant to the No-Fault Motor Vehicle Insurance Act, and denied liability on the part of [T]. [X] also signed the affidavit annexed to the reply to new matter which states that [X] is the attorney for [T] and he was authorized to take the affidavit. [X] forwarded a copy of the reply to respondent and [W], counsel to [V]. Respondent never advised [T] that the pleading filed by [X] was in [T's] best interest.

Although respondent admitted he would have filed the same exact pleading, he objected to [X's]

filing of the reply. By letters dated April 3, April 13, and April 22, 1981, respondent advised [X] that respondent did not agree with some of the assertions that [X] had made in the reply to new matter; denied [X] had [T's] authorization to sign the affidavit; and requested [X] to withdraw the reply. By letter dated April 16 and 25 of 1981, [X] advised respondent that he believed his representation of [T] was proper and welcomed the opportunity to meet with respondent and [T]. By letter dated April 25, 1981, copied to respondent, [X] requested [T] to contact him for an appointment to discuss the case. By letter dated May 8, 1981, to [T], copied to respondent, [X] confirmed the telephone conversation of May 7, 1981, in which [T] indicated he would check with respondent to arrange for an appointment.

Subsequently, respondent and [T] failed to respond to [X's] communication and thus, no meeting was ever scheduled. [X] did not withdraw the reply to new matter that he had filed on behalf of [T]. Thereafter, respondent prepared a document which would prevent [X] from further contacting [T]. Pursuant to respondent's advice, [T] signed the document.

In October of 1982, respondent served a request for production of documents upon [X]. [X] responded by producing all materials he believed were "discoverable." [X] was willing to share with respondent the report in the [L] file that indicated [T] had run a red light, but did not want to disclose this information to counsel for [V] through an answer to a discovery request. By letters dated October 11, 1982, and October 18, 1982, respondent demanded [X] to supplement his answer to the request for production of documents or respondent would file a motion for sanctions. [X] responded by letters dated October 15, 1982, and October 21, 1982, in which

[X] advised respondent that he had produced all discoverable materials in his possession and he would check again with [L]. He also offered respondent to review the relevant portions of his file and invited respondent to contact him to discuss the matter further. Respondent never contacted [X] to review the contents of the files as offered. By letter dated November 18, 1983, [X] wrote to [Y], court administrator, copied to [W] and respondent, requesting the *[T] and [U] v. [V]* be listed for a settlement conference. By letter dated November 21, 1983, respondent requested that [Y] not "waste my time" in scheduling a settlement conference. As a result, a settlement conference was not scheduled.

On April 4, 1984, petitioner sent respondent a letter of inquiry concerning respondent's representation of [T] and [U]. Thereafter, respondent advised [T] that he would not continue in his representation. [T] wrote to respondent and asked respondent to either continue working on his case or formally withdraw. Eventually, respondent continued to represent [T].

In April of 1984, respondent left [T] and [U] at his office for several hours while he attended a settlement conference concerning their case before Judge [Z]. Without discussing a settlement amount with his clients, respondent negotiated a settlement with [L] on behalf of both [T] and [U]. [U] was to receive a total amount of $6,000 for her claim, with $1,000 to be paid through [T's] insurance policy and $5,000 to be paid through [V's] insurance policy. [T's] case settled for $9,000. When respondent returned from the settlement conference he advised [T] that his case had settled for $9,000 and [U's] had settled for $5,000, but failed to advise [T] that his insurance policy was contributing toward the settlement of [U's] claim. On April 23, 1984, the case *[T] and [U]*

*v.* [V] was marked settled by order of judge [Z]. On the same day, after the case was marked settled, respondent requested additional money from defendant's counsel for [T's] property damage claim. [W] conveyed an offer of $350. Also on the same day, [L] issued a draft in the amount of $9,350 in full settlement of [T's] claim.

Thereafter, [T] advised respondent orally, later confirmed by letter dated May 15, 1984, that he was dissatisfied with the settlement amount of his claim and requested respondent to reopen settlement negotiations on his behalf. By letter dated April 30, 1984, respondent informed Judge [Z] that [T] was dissatisfied with the amount offered for settlement and requested a settlement conference be scheduled in regard to the matter. By letter dated May 2, 1984, Judge [Z] declined to schedule a conference and suggested the attorneys settle the matter or respondent file with the court whatever motions he deemed appropriate to reopen the matter on the record. After [T] received a copy of Judge [Z's] letter, [T] met with respondent on approximately six occasions and reviewed the facts of the case. Subsequent to these review sessions, [T] contacted respondent by telephone and inquired as to the status of his case. On these occasions, respondent would ask [T] who the lawyer was and then provide [T] with no further information. Respondent took no further steps to renegotiate or resolve the claims of [T] nor did he file any motion to reopen the matter with the court.

By letter dated October 22, 1984, [AA], a claim superintendent at [L] requested respondent to process the $9,350 draft in regard to the settlement of the [T] matter. By letter dated October 23, 1984, respondent replied to [AA's] letter stating the following: The case was not settled; he did not receive any checks; he would "never deal with [W] again;"

and later that week he intended to file a motion to set aside the "alleged settlement." Subsequent to his letter, respondent took no further action to reopen the matter.

In February 1986, [T] contacted [W] inquiring as to the status of the settlement. [W] suggested that [T] speak to respondent. By letter dated February 20, 1986, [T] informed respondent that he believed respondent was in possession of a settlement check and requested respondent's response within 10 days. Respondent denied receipt of the [L] check and requested [T] to identify his source and contact him immediately. By letter dated March 13, 1986, [T] discharged respondent as his counsel. [T] retained new counsel, [BB], Esquire, who had resolved [T's] claims with [L].

By letter dated May 24, 1984, [CC], Esquire, an associate of [X's] wrote to respondent stating that while there was a delay in the settlement of [T's] claims, the settlement agreement for [U] was still in effect and could be concluded. On several occasions [CC] discussed with respondent the prospect of settling only [U's] claim. On each occasion, respondent informed [CC] that there was nothing to be done about [U's] case as it was respondent's intention to set aside the entire settlement. [CC] had in his possession a settlement draft in the amount of $1,000 payable to [U] and respondent for which [CC] provided respondent a release to be executed by [U]. Respondent never provided [U] the release which was available for her signature in May of 1984. By letter dated December 13, 1985, [U] requested information as to the status of her case and informed respondent that she believed he was in possession of her settlement check. Respondent failed to reply and never discussed with [U] the

conclusion of her case. [U] has not received any funds in regard to the settlement of her claim.

(3) Discussion

In the *[T]/[U]* matter, respondent represented both [T] and [U] in their claims for personal injuries and property damage arising from an automobile accident. Despite the potential conflict of interest, respondent filed suit on behalf of both [T] and [U]. But, respondent failed to make a direct claim against [T] on behalf of [U]. Even after the defendant, [V] joined [T] as an additional defendant in regard to the [U] claim, respondent did not withdraw as counsel for either party.

Thereafter, respondent negotiated a settlement on behalf of both [T] and [U]. After the case was marked settled by Judge [Z], [T] advised respondent that he was not satisfied with his settlement. On the other hand [U] clearly agreed to the settlement amount of her claim. The only reason [U] did not receive the settlement funds she was entitled to was because of the problems respondent encountered with the [T] settlement. Respondent's dispute with [T] should not have affected [U's] claim. Clearly, a conflict of interest existed and respondent had a duty to either conclude [U's] settlement or advise her to obtain alternative counsel. Respondent failed to take any action to resolve this conflict.

The board concurs in the Hearing Committee's determination that respondent's conduct constituted a violation of D.R. 5-105(B) which prohibits a lawyer from continuing multiple employment if the exercise of his independent professional judgment on behalf of that client will be adversely affected by his representation of another client.

### E. *Charge V (34 D.B. 86)—The [DD] Case*

(1) Findings of Fact

On July 28, 1978, [DD] sustained injuries while a passenger in the vehicle owned and operated by [EE]. Shortly after the accident, [DD] retained respondent to represent him in his claim against [EE] for personal injuries and his claim for benefits under the Pennsylvania Motor Vehicle No-Fault Insurance Act. Respondent initiated suit on behalf of [DD] against [EE] who was insured by [L] Insurance Company.

On June 25, 1981, an arbitration hearing was held in the [EE] suit at which [FF] appeared on behalf of [L] and [GG], an associate of respondent appeared on behalf of [DD]. At the hearing, [L] conceded liability and the only issue to be determined by the arbitration panel was an assessment of [DD's] damages. However, [DD] did not testify at the hearing because [GG] instructed him to leave the hearing. According to respondent, [GG] informed the arbitrators that Judge [HH] had allowed the arbitration to be continued, that he was only prepared to take the deposition of Dr. [II], a treating physician, and he would not proceed with the hearing. The arbitrators entered an award in favor of [EE], the defendant. Respondent was able to schedule a new arbitration hearing for [DD] by obtaining an order dated July 20, 1981, from Judge [JJ] vacating the prior award. On June 17, 1982, at the second hearing, the arbitrators entered an award in favor of defendant, [EE], because [DD's] medical bills excluding physical therapy did not meet the $750 monetary threshold. On June 25, 1982, respondent appealed this award.

Under cover of letter dated March 19, 1984, [FF] served upon respondent supplemental interrogatories seeking to update the prior answers regarding

[DD's] treatment, treating physicians and wage loss. Respondent failed to file answers to the supplemental interrogatories and as a result [FF] filed a motion for sanctions on May 25, 1984. Respondent filed a response to the motion for sanctions stating that the requested information was redundant and he had previously supplied the information. The court never ruled on this matter.

On June 20, 1984, the matter went to trial before Judge [KK]. During the first day of trial, [DD] was on the stand testifying when the trial was adjourned for the day. After the adjournment, [DD] returned with respondent to respondent's office. Present at respondent's office was a physician who had not treated nor examined [DD]. Respondent advised [DD] that the physician would be testifying as an expert witness based on [DD's] records. [DD] walked out of respondent's office and failed to appear at the trial the next day. According to [DD] he refused to appear at the trial because respondent tried to persuade him to falsely testify that he was treated by this physician. Respondent claims [DD] did not appear at trial to conclude his testimony because [DD] was afraid to be cross-examined on his prior criminal and work records.

On June 21, 1984, a settlement conference was held before Judge [KK]. At the conference, respondent negotiated a settlement in the amount of $7,500. By letter dated June 21, 1984, respondent informed [DD] of the following: [DD] failed to cooperate; respondent accepted an offer of $7,500, otherwise [DD] would have received nothing; and further communication will be conducted by mail.

Respondent also brought suit on behalf of [DD] for no-fault benefits. On October 4, 1982, an arbitration hearing was held in regard to the no-fault suit in which the panel awarded [DD] $8,000. Under

cover of letter dated November 15, 1982, [LL], Esquire, counsel for [L], forwarded to respondent a settlement draft in the amount of $8,000 payable to [DD]. [LL] also requested respondent to forward an executed order to satisfy. There was a delay in forwarding this settlement draft to respondent because [L] erroneously made the first draft payable to the defendant, [EE], instead of [DD]. On November 17, 1982, respondent filed a writ of execution against [L] in the no-fault suit alleging [L's] failure to timely pay the award. On December 3, 1982, [L] filed a petition to dissolve the writ of execution which was granted by order of Judge [Q] on February 17, 1983.

By letter dated March 17, 1983, hand-delivered to respondent, [LL] tendered a draft in the amount of $124.99 representing the interest and costs which had accrued on the $8,000 award. By letter dated March 30, 1983, delivered to Judge [Q], respondent complained that [LL] had assessed the interest due on the award at an incorrect rate. However, respondent never advised [LL] as to the amount of interest he believed appropriate.

By letter dated August 30, 1984, [FF] advised respondent that two drafts, one in the amount of $8,000 representing the no-fault settlement and another in the amount of $7,500 representing the [EE] case settlement, would be hand-delivered to respondent's office upon receipt of the two executed orders to settle. Respondent refused to provide the orders to settle before receipt of the drafts. By letter dated November 26, 1984, [FF] requested the court's assistance to conclude the matter. On December 12, 1984, Judge [KK] issued two orders, one in the [EE] suit and the other in the no-fault suit, directing that the two cases be marked as settled, discontinued and ended, with prejudice, upon the

record. Under cover of letter dated December 14, 1984, [FF] forwarded to respondent the two settlement drafts.

On January 14, 1985, respondent filed an appeal from Judge [KK's] order dated December 12, 1984, as it pertained to the no-fault suit. By order and opinion dated June 10, 1986, the Superior Court remanded the case for further proceedings on the issue of the contested settlement. On March 24, 1986, a hearing was held before Judge [KK] at which respondent and [L] agreed to settle the matter upon payment of an additional $500 by [L]. On March 25, 1986, respondent filed an order to satisfy in the no-fault suit.

Meanwhile, [DD] wrote to respondent by letter dated February 8, 1985, inquiring why he had not received disbursement of the settlement of funds. By letter dated February 11, 1985, respondent requested [DD] to make an appointment with respondent in order to endorse the drafts. Despite the fact respondent received the settlement drafts in December of 1984, respondent advised [DD] that he had just received them. In March of 1985, [DD] endorsed the settlement draft and subsequently received a disbursement of the settlement funds in the amount of $7,088.99. By letter dated March 26, 1985, [DD] requested respondent to provide him with a copy of the contingent fee agreement, a statement of distribution, copies of documents signed by [DD], and also requested to be advised whether respondent deducted any fees from the $8,000 no-fault draft. Although this letter was sent by certified mail and received by respondent's office on March 27, 1985, respondent failed to respond. Respondent still has in his possession a $500 check representing attorney fees and costs and a check for

approximately $500 representing the additional interest awarded to [DD].

(2) Discussion

The charge in the [DD] case arose from [DD's] accusations that respondent asked [DD] to testify falsely during a trial and respondent failed to timely distribute to [DD] settlement funds. After the first day of the trial, [DD] returned with respondent to respondent's office where respondent introduced [DD] to a physician who had not treated nor examined [DD]. According to [DD], respondent wanted him to falsely testify that he was treated by this physician. [DD] claims that it was for this reason that he walked out of respondent's office and failed to appear at the second day of trial. Respondent claims that he advised [DD] that the physician would only testify as an expert witness based on [DD's] records. Respondent further testified that the reason [DD] failed to appear at the trial to conclude his testimony was because [DD] was afraid to be cross-examined on his prior criminal and work records. [DD] was involved in domestic quarrels which included physically abusing his wife and being arrested for beating his brother-in-law. During his employment at [MM] Ice Cream, [DD] often argued with his supervisor and was constantly warned for insubordination. [DD] also admitted; ''I was getting ready to beat [a co-worker] because he jumped in my face.'' After he was fired from [NN], [DD] removed a bypass from his property so that he may receive gas into his home free of charge. The Hearing Committee found respondent's testimony to be credible and the board concurs in this determination.

Despite [DD's] failure to appear at the trial to conclude his testimony, respondent managed to settle the case on his client's behalf in the amount of

$7,500. Distribution of the settlement funds was made difficult by the fact respondent and [DD] were involved in a dispute which included the exchange of threats. Respondent was angry with [DD] for his failure to cooperate. [DD] reciprocated the anger because respondent yelled at [DD] in the presence of Mrs. [DD]. Respondent attempted to distribute the funds and told [DD] to meet him in his office on Sunday. [DD] failed to meet respondent at the appointed time because he did not trust respondent as indicated by the following statement made by [DD]: "Like I say, my mom and everything else told me they thought that you was up to something. I'm not a fool, [respondent]. That wasn't even a business day. A businessman don't do no business on a Sunday." In March of 1985, [DD] received his share of the settlement funds.

The board concurs in the Hearing Committee's determination that the allegations made against respondent were not proven by clear and convincing evidence. Thus the charges in the [DD] case are dismissed.

### F. *Charge I (19 D.B. 87)—The [OO] Case*

(1) Findings of Fact

On November 17, 1980, [OO] was injured in an automobile accident in which [OO's] vehicle collided with a vehicle owned and operated by [PP]. Respondent was retained to represent [OO] in his claim for personal injury and property damage and [QQ's] derivative claim for the loss of consortium. [OO] executed a contingent fee agreement with respondent. On October 27, 1982, respondent filed suit in the Court of Common Pleas in [ ] on behalf of [OO and QQ] in the matter captioned *[OO]* and *[QQ] v. [PP]*.

On March 14, 1981, [QQ] sustained personal injuries in a separate automobile accident occurring in [ ] County. [QQ's] vehicle collided with a vehicle operated by [RR]. [OO and QQ] retained respondent to represent them in all claims arising from [QQ's] accident. On January 21, 1983, respondent filed suit in the Court of Common Pleas of [ ] County in the matter captioned *[QQ] and [OO] v. [RR]*.

[OO] advised respondent that he was dissatisfied with respondent's attitude and did not appreciate the manner in which respondent treated [OO]. [OO] found respondent's bad temper offensive, particularly respondent's habit of yelling at [OO] during the course of his representation. Respondent advised [OO] that if he was dissatisfied with respondent's representation, [OO] should retain other counsel. In July of 1983, both [OO] and [QQ] discharged respondent and retained [SS], Esquire to undertake representation of the matter previously handled by respondent. At the time respondent was discharged he had already finished most of the legal work in the *[OO and QQ] v. [RR]* case.

By letter dated August 1, 1983, [SS] requested respondent to file a withdrawal of appearance in the matter of *[OO and QQ] v. [RR]* and *[OO and QQ] v. [PP]* so that [SS] could enter his appearance as counsel in these matters. By letter dated September 26, 1983, [SS] requested respondent to contact him in regard to the transfer of the two [OO and QQ] files. [SS] also offered to protect respondent's lien or other interests in the files. [SS] made a visit to respondent's office requesting the release of the files, but respondent advised [SS] that he would not relinquish the files. Respondent admits [SS] asked him on numerous occasions to relinquish the [OO and QQ] files and withdraw his appearance, but

respondent refused to do so explaining that [SS] was not "counsel of record."

In the interim, [TT], counsel for defendant, [RR], wrote a letter dated September 15, 1987, addressed to the Honorable [UU] requesting the court to issue orders directing respondent to comply with discovery requests and to produce his client for deposition. On September 28, 1983, respondent agreed to the scheduling of [QQ's] deposition for October, but failed to advise [TT] that he had been discharged from further representation of [OO and QQ].

On September 30, 1983, [SS] informed [TT] that [SS] was assuming the representation of [OO and QQ], he wanted to review the file and he would be present with [QQ] at her deposition scheduled for October 21, 1983. [SS] attempted to reconstruct [QQ's] file by contacting doctors to obtain records and by reviewing [TT's] file and the court file.

By letter dated October 21, 1983, addressed to respondent and copied to [SS], [TT] tendered an offer of settlement in *[OO] and [QQ] v. [RR]* in the amount of $19,500. By letter dated October 21, 1983, respondent confirmed the receipt of [TT's] settlement offer and the scheduled time for [QQ's] deposition. Respondent also informed [TT] that he had not been in contact with [QQ] for several weeks and she had hung up the telephone on respondent's associate.

On October 21, 1983, [TT] took the deposition of [QQ] who was represented by [SS]. By letter dated October 24, 1983, addressed to [SS], [TT] made an offer of settlement of [QQ's] case in the amount of $21,000. [OO and QQ] accepted the settlement offer of $21,000 in settlement of *[OO and QQ] v. [RR]* and signed a general release in favor of [RR] and [VV] Insurance. [TT] forwarded a $6,000 check to respon-

dent in payment of his fee and a $15,000 check to [SS] on behalf of [OO and QQ].

In the interim, respondent filed a petition for distribution in the matter of *[OO and QQ] v. [RR]* seeking attorney's fees representing 50 percent of the $19,500 settlement offer plus costs. On October 31, 1983, [SS] filed a petition seeking leave of court to enter his appearance in the matter of *[OO and QQ] v. [RR]* and the withdrawal of respondent's appearance in the matter. On November 10, 1983, respondent filed an answer to [SS's] petition to enter appearance, but failed to withdraw his own appearance in the matter. On November 28, 1983, a hearing was held before Judge [UU] at which respondent agreed to accept the sum of $6,000 as payment in full for his fees and costs in the matter of *[OO] and [QQ] v. [RR]*. Respondent further agreed as a condition of the settlement that he would withdraw his appearance as counsel for [OO] in the *[OO and QQ] v. [PP]* matter pending in [ ] County. [SS] agreed to pay respondent a one-third referral fee plus costs from any recovery received in *[OO and QQ] v. [PP]*.

On November 14, 1983, [SS] entered his appearance on behalf of [OO and QQ] in the matter captioned *[OO and QQ] v. [PP]*. By letter dated November 18, 1983, [SS] forwarded a copy of his appearance to respondent and requested respondent to withdraw his appearance. [SS] also requested respondent to release [OO and QQ's] file to him and offered to pay any costs incurred in the file upon receipt. Pursuant to a petition filed by [SS], a rule was entered returnable on March 27, 1984, before the Honorable [WW] for respondent to show cause why he should not enter his withdrawal of appearance in the *[OO and QQ] v. [PP]* matter. On March 12, 1984, respondent filed an answer to the petition in which he stated that he had no objection to

signing a withdrawal of appearance if [SS] would only send him one. On March 27, 1984, the date the rule to show cause was due, respondent filed a petition for the recusal of Judge [WW] in the matter of *[Respondent] v. [XX]* a caption consolidating four separate cases, including *[OO and QQ] v. [PP]*. By order and opinion dated June 12, 1984, the Honorable [YY] dismissed respondent's petition for recusal of Judge [WW] finding no basis for respondent's allegations of prejudice against him by Judge [WW].

On December 14, 1984, Judge [WW] entered an order granting [SS's] petition seeking respondent's withdrawal and directing [SS] to pay respondent a one-third referral fee plus costs from any recovery received in *[OO and QQ] v. [PP]*. On September 6, 1985, the Superior Court reversed the order of Judge [WW] and remanded the matter for further proceedings finding it was error for the trial court to rely upon the disposition of another case, in another county where the record in the Court of Common Pleas of [ ] did not establish the terms and conditions of the [ ] County case. The matter was remanded to the Court of Common Pleas of [ ] and was assigned to the Honorable [ZZ] for further proceedings consistent with the order of the Superior Court. In November of 1985, a conference was held before Judge [ZZ] at which respondent agreed to accept the terms of the agreement made in [ ] County in which respondent would withdraw his appearance, relinquish the file to [SS], send [SS] a statement of his costs, and receive a one-third fee plus his costs. Respondent failed to forward to [SS] a statement of his costs as agreed and never relinquished the file in the *[OO and QQ] v. [PP]* matter.

(2) Discussion

Petitioner has demonstrated by clear and convincing evidence that respondent was discharged by [OO and QQ]. Notwithstanding the discharge, respondent continued to represent [OO and QQ], did not send new counsel his withdrawal of appearance and did not promptly turn over the files. Although respondent completed most of the legal work in the [OO and QQ] matter at the time he was discharged, respondent had a duty to withdraw his appearance and turn over the files to [SS]. Respondent had remedies to protect his economic interests other than refusing to retain his clients' files after discharge. Thus, the board concurs in the Hearing Committee's determination that respondent's conduct constituted a violation of D.R. 2-110(B)(4).

### G. *Charge II (19 D.B. 87)—* *The [AAA and BBB] Matter*

(1) Findings of Fact

In May of 1978, [AAA] and [BBB] were involved in a motor vehicle accident. In June of 1978, [AAA] and [BBB] retained respondent to represent them in all claims arising from the accident. Respondent commenced suit on behalf of [AAA and BBB] in the Court of Common Pleas of [ ] County in the matter of *[AAA and BBB] v. [CCC]*. Respondent engaged in settlement negotiation on behalf of [AAA and BBB] with [DDD], Esquire a member of the firm retained to represent defendant [CCC].

By letter dated November 25, 1981, [DDD] confirmed the settlement of the case for a total of $10,000; forwarded two releases to be executed by respondent's client and praecipe to settle, discontinue and end the matter; and advised respondent that he would forward the settlement drafts upon his receipt of the signed release and praecipe. In De-

cember of 1981, respondent forwarded the executed release and advised [DDD] that he would return the praecipe to settle upon respondent's receipt of the checks. Thereafter, [DDD] forwarded two settlement drafts to respondent who returned the executed order to settle, discontinue and end the matter. Respondent distributed a total of $4,000 to [AAA and BBB] in settlement of the claims and withheld $6,000 for medical bills which were not covered by the insurance.

[AAA and BBB] informed respondent that they believed they were covered by an automobile insurance policy issued by [EEE] Insurance Company. By letter dated June 5, 1978, respondent filed a claim with [EEE] for personal injury protection benefits on behalf of [AAA and BBB]. By letter dated June 12, 1978, [EEE] denied coverage of [AAA and BBB's] claim for PIP benefits claiming that the insurance policy had been canceled prior to the May 21, 1978, accident. In September of 1980, respondent commenced suit on behalf of [AAA and BBB] against [EEE] for PIP benefits. In October of 1984, an arbitration hearing was held in the matter of *[AAA and BBB] v. [EEE]* at which respondent and [AAA and BBB] chose not to appear. At the request of counsel for [EEE], the arbitrators entered an award in favor of [AAA and BBB] for the amount of the medical bills only. Respondent filed an appeal from the award of arbitrators on November 9, 1984.

In the interim, on January 23, 1984, respondent filed an uninsured motorist claim on behalf of [AAA and BBB]. On August 24, 1984, respondent filed a petition to appoint a neutral arbitrator and compel arbitration in the Court of Common Pleas of [ ] in the matter of *[AAA and BBB] v. [FFF]*. By filing this petition, respondent represented to the court that [AAA and BBB] were injured by the action of an

unknown or uninsured motorist and thus, were entitled to make a claim for uninsured motorist benefits under their personal insurance policy. [EEE] through [FFF] filed a reply to the petition denying that [AAA and BBB] were insured by [EEE] on the date of the accident.

By order dated November 20, 1984, the Honorable [Q] denied respondent's petition to appoint a neutral arbitrator in the uninsured motorist matter. On December 17, 1984, respondent filed a petition for reconsideration of Judge [Q's] order and a few days later Judge [Q] vacated his prior order pending response from [FFF]. On January 4, 1984, [FFF] filed its answer to respondent's petition for reconsideration, and again denied that [AAA and BBB] were covered by a [EEE] insurance policy at the time of the accident. By order dated January 21, 1985, Judge [Q] ordered that depositions be taken to determine whether or not a contract of insurance existed between the parties at the time of the accident on May 21, 1978.

On February 13, 1985, [GGG], Esquire, counsel for [FFF] took the deposition of [AAA]. At the deposition, [AAA] was asked whether she had specifically requested the insurance agent to obtain automobile insurance for [AAA and BBB] through [EEE]. [AAA] testified that she could not remember what had been said to the agent when she and her husband went to review their insurance policy. Upon [AAA's] response, respondent became angry because he had spent approximately nine hours reviewing the facts with [AAA], including the fact that she had paid the agent for the purchase of [EEE] insurance. Respondent threw a case file in [AAA's] direction, but did not hit her. Respondent also told [AAA], in a loud voice, in the presence of [GGG] and the court reporter that [AAA] should get

out and that she was stupid. When [AAA] left, he slammed the door behind her. The deposition of [AAA] was never filed with the court. On April 4, 1985, Judge [Q] issued an order deeming it admitted that no contract of insurance existed between [AAA and BBB] and [EEE] on the date of the accident, May 21, 1978.

On April 15, 1985, respondent sent a letter and notice of deposition to [GGG] seeking the deposition of employees of [HHH] Inc. [GGG], on behalf of [EEE], sought a protective order from respondent's attempt to depose the employee's of [HHH] Inc. stating the *[AAA and BBB] v. [FFF]* matter was dismissed. By order dated April 30, 1985, Judge [Q] ordered a hearing to be held to determine whether respondent still represented [AAA and BBB]. Judge [Q] also vacated his order of April 4, 1985, in which he had previously deemed admitted that no insurance contract existed between [AAA and BBB] and [EEE]. At the hearing held before Judge [Q] on June 26, 1985, [GGG] advised the court that respondent had stated that he no longer represented [AAA]. By order dated July 2, 1985, Judge [Q] directed both [AAA and BBB] to submit affidavits to the court stating whom they chose to represent them in the *[AAA and BBB] v. [FFF]* matter.

By letter dated July 18, 1985, respondent wrote to [AAA and BBB] at their respective addresses requesting that each sign an enclosed affidavit agreeing to respondent's continued representation. Respondent also stated that if they did not return the endorsed affidavits by July 22, 1985, he would sue them for seven years of attorney fees and costs. [AAA and BBB] declined to sign the affidavits prepared by respondent and retained the services of [III], Esquire in any remaining claims arising from the May 21, 1978, accident. On July 23, 1985, and

August 8, 1985, [AAA] and [BBB] signed an affidavit indicating that they each discharged respondent and had retained [III] to represent them in their remaining claims. These affidavits were submitted to the court, respondent, and opposing counsel.

Between July 1985 and November 1985, [III] contacted respondent on several occasions in an attempt to learn the status of the outstanding claims and to obtain [AAA and BBB's] files. By letters dated October 11, 1985 and November 15, 1985, [III] requested respondent to provide an accounting of the personal injury proceeds being held in escrow on behalf of [AAA and BBB]. Respondent failed to release any portion of the [AAA and BBB] files and never advised [III] whether he was holding monies in escrow on behalf of [AAA and BBB].

In January of 1986, [III] resolved [AAA and BBB's] PIP claims in the amount of $1,400 representing the amount of the outstanding medical bills only.

(3) Discussion

In the [AAA and BBB] matter, petitioner charges respondent with engaging in dishonest conduct in regard to the filing of the uninsured motorist claim on behalf of [AAA and BBB]. The board concurs in the Hearing Committee's determination that the petitioner did not prove by clear and convincing evidence that the uninsured motorist claim was improper. Questions were raised by [EEE] as to whether [AAA and BBB] purchased an insurance policy from [EEE] and whether a third, unidentified, vehicle was involved in the [AAA and BBB] accident. Respondent's position is that these questions raised by [EEE] are questions of fact which should be determined by a panel of arbitrators. For purposes of this disciplinary proceeding the board agrees.

The second charge against respondent involves the incident which occurred at the depositions of [AAA]. Respondent spent approximately nine hours reviewing the facts with [AAA], including the fact that she had purchased a [EEE] insurance policy. At the deposition, [AAA] testified that she could not remember what she and her husband had said to the agent. Respondent became upset, lost his temper, and threw the file which hit the wall near [AAA]. Although the board in no way condones respondent's actions, the board does not believe that an attorney losing his temper in a situation such as the one described is a violation of the Disciplinary Rules of the Code of Professional Responsibility.

Along with the Hearing Committee, the board is also troubled that respondent may not have properly accounted for the escrowed funds held for [AAA and BBB's] unpaid medical expenses. However, petitioner did not meet its burden to prove by clear and convincing evidence that a proper accounting was not rendered or that respondent failed to make the appropriate payments.

Finally, the board concurs in the Hearing Committee's determination that respondent's conduct constituted a violation of D.R. 2-110(B)(4) which requires an attorney to withdraw from representation upon discharge by his clients. It is clear that [AAA and BBB] discharged respondent and retained [III] to assume representation. Respondent failed to withdraw from representation and failed to release to [III] the [AAA and BBB] file.

## H. *Charge III (19 D.B. 87)—* *The [JJJ and KKK] Matter*

(1) Findings of Fact

On November 10, 1979, [JJJ] and her son, [KKK], were involved in an automobile accident with a

vehicle owned and operated by [LLL]. After the accident, [LLL] fled the scene and was involved in a police chase. At all times relevant to the accident, [JJJ and KKK] were insured under a policy from [MMM] Insurance Company and [LLL] was insured by [NNN] Insurance Company. Several weeks after the accident, [JJJ and KKK] retained respondent to represent them in their claims arising from the accident.

On December 7, 1979, [NNN's] claims adjuster, [OOO], contacted respondent by telephone and advised him that [NNN] conceded the negligence of its insured, [LLL], and believed the case could be settled. During the conversation with [OOO], respondent stated that he would not deal with any insurance adjuster in the state of Pennsylvania, he was fed up with insurance companies, he would place the [JJJ and KKK] matter in suit within six months, and [OOO] was not to call respondent again.

On November 30, 1979, respondent made a property damage claim with [MMM] and submitted an estimate for repairs of the [JJJ and KKK] vehicle in the amount of $3,086. [MMM] paid approximately $3,500 to [KKK] for the damage to his vehicle and [NNN] reimbursed [MMM].

In December of 1979, respondent filed a claim with [MMM] on behalf of [JJJ and KKK]. By letter dated December 18, 1979, [PPP], a casualty claims adjuster for [MMM], advised respondent that [LLL] was covered by an insurance policy with [NNN] and provided respondent with the policy number and the name of the [NNN] claims adjuster handling the matter. [PPP] also advised that [JJJ and KKK's] claims for PIP benefits were subject to a coordination of benefits provision in their policy which

included [JJJ and KKK's] coverage by their Blue Cross and Blue Shield health insurance policy.

In November of 1981, respondent filed suit on behalf of [JJJ and KKK] and against [LLL] in the Court of Common Pleas in [ ]. Respondent filed an affidavit of service in *[JJJ and KKK] v. [LLL],* but [LLL] failed to turn the pleadings over to [NNN]. On December 21, 1982, respondent obtained a default judgment against [LLL]. [LLL] failed to notify [NNN] of the judgment. In fact, the claims adjuster from [NNN] handling the claims against [LLL] was not aware of the lawsuit, *[JJJ and KKK] v. [LLL]* until the disciplinary hearing. Respondent took no further action in the *[JJJ and KKK] v. [LLL]* matter, nor did he take any steps to enforce the default judgment entered against [LLL].

From December 21, 1982, through January 17, 1983, respondent and [QQQ], a general claims representative for [MMM], exchanged a series of letters in regard to [JJJ] and [KKK's] claim for uninsured motorist benefits. Respondent, notified [MMM] of his representation of [JJJ and KKK], advised [MMM] that he was filing an uninsured motorist claim on behalf of [JJJ and KKK] and requested [MMM] to select an arbitrator for an uninsured motorist arbitration. Respondent did not address the issue of [LLL's] insurance coverage by [NNN]. [QQQ] advised respondent that [LLL] was insured by [NNN], informed him that [RRR] was the [NNN] adjuster handling the matter, requested respondent to state the basis for making the uninsured motorist claim, and finally referred respondent to [SSS], Esquire, counsel for [MMM].

On February 24, 1983, respondent filed a petition to appoint neutral arbitrator and compel arbitration in the Court of Common Pleas of [ ]. [MMM] refused

to designate its arbitrator, thus the court appointed an arbitrator on behalf of [MMM] in the *[JJJ and KKK] v. [LLL]* matter. On May 11, 1983, an arbitration hearing was held in regard to the claim for uninsured motorist benefits. The arbitration panel entered an award in favor of [JJJ and KKK] in the amount of $10,500. On May 24, 1983, respondent filed a petition to confirm the arbitration award. On June 13, 1983, [SSS] filed a petition to vacate the arbitration award alleging that respondent testified fraudulently at the hearing in regard to his knowledge concerning [LLL's] insurance coverage. On June 21, 1983, the Honorable [Q] entered an order confirming the award of arbitration. On June 28, 1983, [SSS] filed a petition to reconsider and vacate award of arbitrators based upon the insured status of [LLL] and respondent's knowledge of such. On July 7, 1983, Judge [Q] vacated his order confirming the award of arbitrators and on September 14, 1983, entered an order directing that depositions be taken on the issue of whether or not [LLL] was insured by a policy of insurance issued by [NNN] at the time of the accident. Respondent filed a petition requesting the court to reconsider the order of September 14, 1983. Respondent's petition was denied. On November 10, 1983, pursuant to Judge [Q's] order, the depositions of [QQQ] of [MMM] and [OOO] of [NNN] were taken. In their depositions, [QQQ] and [OOO] testified as to the numerous occasions respondent was advised of [LLL's] insurance coverage through [NNN].

On March 7, 1984, Judge [Q] issued an order denying respondent's petition to confirm the award of arbitrators and granting [MMM's] petition to vacate the award of arbitrators. On March 12, 1984, respondent filed a notice of appeal to the Superior Court from Judge [Q's] March 7, 1984, order. On

April 23, 1984, Judge [Q] filed an opinion in support of his order dated March 7, 1984, finding, inter alia, "fraud, misconduct, corruption or other irregularity" in violation of 42 Pa.C.S. section 7341 on the part of respondent for his failure to disclose the fact defendant had insurance coverage despite his knowledge of such. On December 21, 1984, the Superior Court affirmed Judge [Q's] March 7, 1984, order and supporting opinion. On January 3, 1985, respondent filed a motion for reargument which was denied by the Superior Court on February 14, 1985. On March 18, 1985, respondent filed a petition for allowance of appeal in the Supreme Court of Pennsylvania from the Superior Court's orders of December 21, 1984, and February 14, 1985. By order dated August 12, 1985, the Supreme Court denied the petition for allowance of appeal. On August 27, 1985, respondent filed a petition for reconsideration with the Supreme Court and on September 6, 1985, respondent filed a supplemental petition for reconsideration with the Supreme Court. By order dated October 18, 1985, the Pennsylvania Supreme Court, per curiam, denied both the petition for reconsideration and supplemental petition for reconsideration. Respondent pursued his appeals claiming that the arbitration award was supported by the evidence at the hearing and thus should not have been vacated by the trial court.

[TTT], a physical therapist who treated [JJJ] for injuries resulting from the accident, submitted his bill to [MMM] in the amount of $540. On June 2, 1980, [MMM] issued a draft in the amount of $540 in partial settlement of [JJJ's] PIP benefits. Respondent failed to make payment to [TTT]. [TTT] contacted [JJJ and KKK] by telephone in early 1983 and by letter dated August 3, 1983, requesting payment. Respondent advised [TTT] that the [JJJ and KKK]

family disputes his bill and warned [TTT] to stop harassing [JJJ and KKK]. Although [JJJ and KKK] changed their minds and directed respondent to make payment to [TTT], the bill remained unpaid.

Thereafter, [UUU] notified [JJJ and KKK] of another unpaid bill for services rendered by Dr. [VVV]. [KKK] paid the $125 bill with a personal check in order to avoid contact with respondent. [KKK] testified that he found respondent obnoxious and resented respondent yelling at him.

On September 29, 1982, respondent initiated suit on behalf of [JJJ and KKK] and against [MMM] for non-payment of PIP/no-fault benefits in the matter of *[JJJ and KKK] v. [MMM]* in the Court of Common Pleas of [ ]. In November of 1982, respondent filed a praecipe and obtained a default judgment against [MMM] in the PIP/no-fault matter alleging [MMM's] failure to timely respond to the complaint. [MMM] filed an answer and also a petition to open the default judgment. On January 12, 1983, Judge [JJ] entered an order granting [MMM's] petition to open default judgment. On January 17, 1983, respondent filed an appeal to the Superior Court from Judge [JJ's] order. On December 3, 1986, the Superior Court reversed and remanded the PIP/no-fault matter to the trial court with directives to take depositions.

From October 1, 1986, through March of 1987, [WWW], counsel to [MMM] and [XXX], a senior claim representative from [MMM], exchanged letters with respondent in regard to the PIP/no-fault matter. [MMM] requested respondent to provide [MMM] with a complete breakdown of the outstanding medical bills and respondent's costs and fees so that a settlement offer could be made. Respondent in turn advised [MMM] to pay the outstanding

medical bills plus interest before he would advise them of the amount of his ever-increasing attorney's fees.

In March of 1987, in an attempt to settle the matter, [WWW] wrote to respondent detailing the amount of [MMM's] proposed settlement, including interest, attorney's fees and costs. Respondent failed to respond. By letter dated March 26, 1987, [WWW] requested Judge [JJ] to schedule a settlement conference in the PIP/no-fault matter. Respondent refused to attend the settlement conference scheduled by Judge [JJ] because respondent believed, since [MMM] was involved, it would be a waste of time. Respondent advised [WWW] and Judge [JJ] that he would rather litigate the matter. The PIP/no-fault matter is currently waiting to be listed for trial.

(2) Discussion

In the [JJJ and KKK] matter, petitioner charged respondent with filing a fraudulent uninsured motorist claim with [MMM] Insurance Company on behalf of [JJJ and KKK]. It is not disputed that defendant, [LLL] was insured by [NNN] Insurance Company at the time of the accident. However, [LLL] failed to cooperate with [NNN] after the accident occurred. [LLL] failed to turn the pleading over to [NNN] after he was served notice of the complaint; he did not file an answer to the complaint; and failed to notify [NNN] that a default judgment was entered against him. Representatives of [NNN] conceded at the disciplinary hearing that [LLL's] conduct after the accident was such that [NNN] would have considered [LLL's] activities a breach of his contract of insurance and would have refused to indemnify or defend him in this matter. In other words, [NNN] would have disclaimed. Disclaimer, of course, renders [LLL] uninsured, giving rise to a

proper uninsured motorist claim by [JJJ and KKK] under their own insurance policy with [MMM].

Therefore, the board concurs in the Hearing Committee's determination that the filing of an uninsured motorist claim under these circumstances did not violate the Disciplinary Rules.

Petitioner also produced evidence that [TTT], a physical therapist who treated [JJJ], was not paid. Respondent's position was that [TTT] was not paid because [TTT] inflated the number of visits, inflated the charges, and failed to cooperate in the processing of the [JJJ and KKK] claim. For these reasons, respondent, with the agreement of [JJJ and KKK], did not pay [TTT's] bill. Respondent's decision not to pay [TTT's] bill is based on a legitimate dispute. The board concurs in the Hearing Committee's opinion that [TTT] has other methods of collection available to him and the disciplinary system should not be used as a bill collector. Therefore, respondent's failure to pay [TTT] is not a violation of the Disciplinary Rules.

Finally, petitioner charges respondent with interfering with the administration of justice by insisting on the litigation of the [MMM] no-fault claim. Although [MMM] may, at this time, be willing to pay the medical bills submitted, there is still the outstanding issue of counsel fees and interest. Disciplinary counsel has not proved, by clear and convincing evidence, that respondent was unreasonable by pursuing this claim. Also the issue whether the medical treatment and bills were reasonable and necessary should be left to the trier of fact. If it is found that [MMM] improperly refused to pay medical expenses, the respondent may litigate the value of the legal services incurred in prosecution of the no-fault claim against [MMM]. The board concurs in the Hearing Committee's determination that respon-

dent did not violate the Disciplinary Rules in regard to his handling of the no-fault claim.

Finding no Disciplinary Rule violations, the charges in the [JJJ and KKK] matter are dismissed.

## IV. GENERAL DISCUSSION

Before the board is an attorney who is an active practitioner perceived by some to be abrasive and unpleasant and against whom eight separate charges have been brought. Having determined that respondent's conduct constitutes a violation of the Disciplinary Rules of the Code of Professional Responsibility, the board must address the issue of the appropriate discipline to be imposed.

It is incumbent upon Disciplinary Counsel to prove these charges by clear and convincing evidence. *Philadelphia Newspapers Inc. v., Disciplinary Board,* 468 Pa. 382, 363 A.2d 779 (1976); *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872, 875 (1986). To meet this burden of proof by clear and convincing evidence, Disciplinary Counsel must present evidence that is so clear, direct, weighty and convincing as to enable the fact finder to come to a clear conviction without hesitancy of the truth of the precise facts in issue. *In re Shivers,* 363 Pa. Super. 225, 525 A.2d 801 (1987). As detailed in the above findings of fact and discussion, few of the charges against respondent were proven by clear and convincing evidence. In fact, many of the charges against respondent failed to stand the rigor of cross-examination. Also, the Hearing Committee found respondent's testimony to be credible throughout the proceeding. Although the board conducts its review of attorney disciplinary cases de novo, the board is guided by the Hearing Committee findings with respect to the issue of credibility. *See,*

*Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 275, 472 A.2d 186, 188 (1983); *Office of Disciplinary Counsel v. Walker,* 469 Pa. 432, 366 A.2d 563, 568 (1976).

In the future, charges should be brought only when there is a reasonable likelihood that there is clear and convincing evidence to prove such charges. The mere fact that respondent does not enjoy universal popularity is not a basis for bringing charges. Respondent should not be disciplined on vague concepts such as too aggressive or frustrating personal style or attempting to maximize recovery for his clients. To allow disciplinary proceedings in connection with allegations that an attorney is "too aggressive" or "not polite" will result in a chilling effect on advocacy, administration of justice and due process.

It is clear that an attorney who does not fit in the conventional mold and who maintains a large and active practice by himself with minimum staff, filing motions, pleadings, petitions, briefs and other tools of his profession in great profusion and utilizing unorthodox methods, will not be subject to discipline merely for his liberal use of appeals and frustrating personal style. Only conduct actually amounting to a violation of the Disciplinary Rules should merit discipline. *In re Anonymous No. 43 D.B. 77 and 43 D.B. 78,* 10 D.&C.3d 637, 645 (1979). Thus, respondent should only be disciplined for the following violations of the Disciplinary Rules of the Code of Professional Responsibility as determined by the Hearing Committee and concurred in by this board: D.R. 2-110(B)(4), D.R. 5-105(B) and D.R. 9-102(B)(4).

The primary purpose of the disciplinary system is not to punish the attorney, but rather to protect the public from unfit attorneys, to maintain the integrity

of the legal system, and to preserve the confidence of the public in the legal profession and the judicial system. *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180, 1186 (1987). Upon examination of the totality of respondent's conduct, as reflected by the evidence in record, including the fact respondent has not been subject to any prior disciplinary proceeding, the board believes respondent's continued practice of law will not adversely affect the integrity of the legal system nor destroy the confidence of the public in the legal profession. Thus, public discipline in this matter is not warranted.

## V. CONCLUSIONS OF LAW

### A. Charge I (34 D.B. 86)—The [A] Case

The board concurs in the Hearing Committee's determination to dismiss Charge I (34 D.B. 86). Respondent did not violate the following Disciplinary Rules:

(1) D.R. 1-102(A)(5)—which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

(2) D.R. 1-102(A)(6)—which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law;

(3) D.R. 6-101(A)(3)—which prohibits an attorney from neglecting a legal matter entrusted to him;

(4) D.R. 7-101(A)(1)—which prohibits an attorney from intentionally failing to seek the lawful objectives of a client through reasonably available means permitted by law and Disciplinary Rules; and

(5) D.R. 7-102(A)(1)—which prohibits an attorney from filing a suit, asserting a position, conducting a defense, delaying a trial, or taking other action on behalf of a client when he knows or when it is

obvious that such action would serve merely to harass or maliciously injure another.

## B. *Charge II (34 D.B. 86)—The [F] Case*

The board concurs in the Hearing Committee's determination to dismiss Charge II (34 D.B. 86). Respondent did not violate the following Disciplinary Rules:

(1) D.R. 2-110(A)(2)—which prohibits an attorney from withdrawing from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of the client.

(2) D.R. 2-110(B)(4)—which requires an attorney representing a client before a tribunal to withdraw from employment and a lawyer representing a client in other matters to withdraw from employment if he is discharged by the client; and

(3) D.R. 9-102(B)(4)—which requires an attorney to promptly pay or deliver to a client as requested by the client funds, securities, or other properties in the lawyer's possession which the client is entitled to receive.

## C. *Charge III (34 D.B. 86)—The [J] Case*

The board concurs in the Hearing Committee's determination that respondent violated the following Disciplinary Rules.

(1) D.R. 9-102(B)(4)—which requires an attorney to promptly pay or deliver to a client as requested by the client funds, securities, or other properties in the lawyer's possession which the client is entitled to receive.

The board also supports the Hearing Committee's conclusion that respondent did not violate the following Disciplinary Rules:

(2) D.R. 1-102(A)(4)—which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(3) D.R. 1-102(A)(5)—which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

(4) D.R. 1-102(A)(6)—which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law;

(5) D.R. 7-101(A)(1)—which prohibits an attorney from intentionally failing to seek the lawful objectives of a client through reasonably available means permitted by law and Disciplinary Rules; and

(6) D.R. 7-101(A)(3)—which prohibits an attorney from intentionally prejudicing or damaging a client during the course of the professional relationship;

(7) D.R. 7-102(A)(1)—which prohibits an attorney from filing a suit, asserting a position, conducting a defense, delaying a trial, or taking other action on behalf of a client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

(8) D.R. 7-102(A)(5)—which prohibits an attorney during his representation of a client from knowingly making a false statement of law or fact; and

### D. Charge IV (34 D.B. 86)—The [T]/[U] Case

The board concurs in the Hearing Committee's determination that respondent violated the following Disciplinary Rules:

(1) D.R. 5-105(B)—which prohibits a lawyer from continuing multiple employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by

his representation of another client, or if it would be likely to involve him in representing differing interests;

The board also supports the Hearing Committee's conclusion that respondent did not violate the following Disciplinary Rules:

(2) D.R. 1-102(A)(5)—which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

(3) D.R. 1-102(A)(6)—which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law;

(4) D.R. 5-105(a)—which requires a lawyer to decline proffered employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests;

(5) D.R. 7-101(A)(1)—which prohibits an attorney from intentionally failing to seek the lawful objectives of a client through reasonably available means permitted by law and Disciplinary Rules; and

(6) D.R. 7-101(A)(3)—which prohibits an attorney from intentionally prejudicing or damaging a client during the course of the professional relationship.

### E. *Charge V (34 D.B. 86)—The [DD] Case*

The board concurs in the Hearing Committee's determination to dismiss Charge V (34 D.B. 86). Respondent did not violate the following Disciplinary Rules:

(1) D.R. 1-102(A)(4)—which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(2) D.R. 1-102(A)(5)—which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

(3) D.R. 1-102(A)(6)—which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law;

(4) D.R. 7-102(A)(1)—which prohibits an attorney from filing a suit, asserting a position, conducting a defense, delaying a trial, or taking other action on behalf of a client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another;

(5) D.R. 7-102(A)(4)—which prohibits an attorney from knowingly using perjured testimony or false evidence;

(6) D.R. 7-102(A)(7)—which prohibits an attorney from counseling or assisting the client in conduct that the attorney knows to be illegal or fraudulent;

(7) D.R. 9-102(A)—which requires that all funds of clients paid to an attorney, except for advances for costs and expenses, be kept in identifiable bank accounts in the state in which the attorney's office is located and that no funds belonging to the attorney shall be deposited therein except for funds sufficient to pay bank charges and funds belonging in part to the client and in part to the attorney;

(8) D.R. 9-102(B)(1)—which requires an attorney to promptly notify a client of the receipt of the client's funds, securities or other properties;

(9) D.R. 9-102(B)(3)—which requires an attorney to maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and to render appropriate accounts to the client regarding them; and

(10) D.R. 9-102(B)(4)—which requires an attorney to promptly pay or deliver to a client as requested by

the client funds, securities, or other properties in the lawyer's possession which the client is entitled to receive.

### F. *Charge I (19 D.B. 87)—The [OO] Case*

The board concurs in the Hearing Committee's determination that respondent violated the following Disciplinary Rules:

(1) D.R. 2-110(B)(4)—which requires an attorney representing a client before a tribunal to withdraw from employment and a lawyer representing a client in other matters to withdraw from employment if he is discharged by the client.

The board also supports the Hearing Committee's conclusion that respondent did not violate the following Disciplinary Rules:

(2) D.R. 1-102(A)(4)—which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(3) D.R. 1-102(A)(5)—which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

(4) D.R. 1-102(A)(6)—which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law;

(5) D.R. 2-109(A)(1)—which prohibits an attorney from bringing a legal action, conducting a defense or asserting a position merely for the purpose of harassing or maliciously injuring another person;

(6) D.R. 2-109(A)(2)—which prohibits an attorney from presenting a claim or defense in litigation that is not warranted under existing law, unless it can be supported by a good faith argument for the extension, modification or reversal of existing law;

(7) D.R. 2-110(A)(2)—which prohibits an attorney from withdrawing from employment until he has

taken reasonable steps to avoid foreseeable prejudice to the rights of the client, including giving due notice to the client, allowing time for the employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules;

(8) D.R. 5-102(A)—which requires an attorney to withdraw as counsel, if, after undertaking employment in contemplated or pending litigation, the attorney learns or it is obvious that he or his firm may be called as a witness on behalf of his client, although he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

(9) D.R. 5-102(B)—which requires a lawyer to discontinue representation in litigation when he may be called as a witness other than on behalf of his client when it is apparent that his testimony is or may be prejudicial to his client;

(10) D.R. 5-105(A)—which requires a lawyer to decline proffered employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests;

(11) D.R. 5-105(B)—which prohibits a lawyer from continuing multiple employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests;

(12) D.R. 7-101(A)(1)—which prohibits an attorney from intentionally failing to seek the lawful objectives of a client through reasonably available means permitted by law and Disciplinary Rules;

(13) D.R. 7-101(A)(2)—which prohibits an attorney from intentionally failing to carry out a contract of employment entered into with a client for professional services;

(14) D.R. 7-101(A)(3)—which prohibits an attorney from intentionally prejudicing or damaging a client during the course of the professional relationship;

(15) D.R. 7-102(A)(1)—which prohibits an attorney from filing a suit, asserting a position, conducting a defense, delaying a trial, or taking other action on behalf of a client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another;

(16) D.R. 7-102(A)(2)—which prohibits an attorney from knowingly advancing a claim or defense that is unwarranted under existing law, except that such a claim or defense may be advanced when it can be supported by a good faith argument for extension, modification or reversal of existing law; and

(17) D.R. 9-102(B)(4)—which requires an attorney to promptly pay or deliver to a client as requested by the client funds, securities, or other properties in the lawyer's possession which the client is entitled to receive.

### G. *Charge II (19 D.B. 87)—* *The [AAA and BBB] Case*

The board concurs in the Hearing Committee's determination that respondent violated the following Disciplinary Rules:

(1) D.R. 2-110(B)(4) - which requires an attorney representing a client before a tribunal to withdraw from employment and a lawyer representing a client

in other matters to withdraw from employment if he is discharged by the client.

The board also supports the Hearing Committee's conclusion that respondent did not violate the following Disciplinary Rules:

(2) D.R. 1-102(A)(4)—which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(3) D.R. 1-102(A)(5)—which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

(4) D.R. 1-102(A)(6)—which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law;

(5) D.R. 2-110(A)(2)—which prohibits an attorney from withdrawing from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of the client, including giving due notice to the client, allowing time for the employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules;

(6) D.R. 6-102(A)—which provides that a lawyer shall not attempt to exonerate himself or limit his liability to his client for his personal malpractice;

(7) D.R. 7-102(A)(2)—which prohibits an attorney from knowingly advancing a claim or defense that is unwarranted under existing law, except that such a claim or defense may be advanced when it can be supported by a good faith argument for extension, modification or reversal of existing law;

(8) D.R. 7-102(A)(3)—which prohibits an attorney from concealing or knowingly failing to disclose that which he is required by law to reveal;

(9) D.R. 7-102(A)(4)—which prohibits an attorney from knowingly using perjured testimony or false evidence;

(10) D.R. 7-102(A)(5)—which prohibits an attorney during his representation of a client from knowingly making a false statement of law or fact;

(11) D.R. 7-102(A)(7)—which prohibits an attorney from counseling or assisting the client in conduct that the attorney knows to be illegal or fraudulent;

(12) D.R. 9-102(B)(3)—which requires an attorney to maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and to render appropriate accounts to the client regarding them;

(13) D.R. 9-102(B)(4)—which requires an attorney to promptly pay or deliver to a client as requested by the client funds, securities, or other properties in the lawyer's possession which the client is entitled to receive.

### H. *Charge III (19 D.B. 87)—*
### *The [JJJ and KKK] Case*

The board concurs in the Hearing Committee's determination to dismiss Charge III (19 D.B. 87). Respondent did not violate the following Disciplinary Rules:

(1) D.R. 1-102(A)(4)—which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(2) D.R. 1-102(A)(5)—which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

(3) D.R. 1-102(A)(6)—which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law;

(4) D.R. 7-102(A)(1)—which prohibits an attorney from filing a suit, asserting a position, conducting a defense, delaying a trial, or taking other action on

behalf of a client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another;

(5) D.R. 7-102(A)(2)—which prohibits an attorney from knowingly advancing a claim or defense that is unwarranted under existing law, except that such a claim or defense may be advanced when it can be supported by a good faith argument for extension, modification or reversal of existing law;

(6) D.R. 7-102(A)(3)—which prohibits an attorney from concealing or knowingly failing to disclose that which he is required by law to reveal;

(7) D.R. 7-102(A)(5)—which prohibits an attorney during his representation of a client from knowingly making a false statement of law or fact; and

(8) D.R. 7-106(C)(5)—which prohibits an attorney from failing to comply with known local customs of courtesy or practice of the law or a particular tribunal without giving opposing counsel timely notice of his intent not to comply.

## VI. DETERMINATION

The Disciplinary Board of the Supreme Court of Pennsylvania hereby determines that the respondent shall receive a private reprimand. The board further recommends that pursuant to Rule 208(g) Pa.R.D.E., respondent be directed to pay the necessary expenses incurred in the investigation and prosecution of this proceeding.

Ms. Heh did not participate in the adjudication.

## ORDER

And now, August 9, 1990, upon consideration of the report and recommendation of Hearing Committee [ ] filed March 15, 1990; it is hereby ordered that

the said [respondent] of [ ] be subjected to private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania as provided in Rule 204(a)(5) of the Pennsylvania Rules of Disciplinary Enforcement. Costs are to be paid by the respondent.